J. S50002/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MARCUS SMITH, | : | No. 311 WDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, October 3, 2012,
in the Court of Common Pleas of Allegheny County
Criminal Division at No. CP-02-CR-0002575-2011

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND ALLEN, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED OCTOBER 14, 2014**

Marcus Smith appeals the judgment of sentence entered on October 3, 2012, in the Court of Common Pleas of Allegheny County.  We affirm.

The facts, as summarized by the trial court, are as follows:

> Appellant spent the morning of February 12, 2011, at the home of Tanisha Helms in the Hill District section of the City of Pittsburgh.  (T.T. 146-147, 157, 593).[Footnote 6]  While there Appellant returned a phone call from his girlfriend, Ashley Woessner, who confronted him about getting another woman pregnant.  (T.T. 476-477).  Appellant, assuming that their mutual friend Dane Smith had told Woessner about the other woman, became upset with Smith.  Smith and Appellant referred to each other as brothers even though they were unrelated.[Footnote 7]  He told Woessner, "Dane is lying.  Say no more, he is gone," and hung up on Woessner.  (T.T. 475, 477, 595).

[Footnote 6] The designation "T.T." followed by numerals refers to Trial Transcript, August 20-23, 2012.

[Footnote 7] It was established that Dane Smith introduced Marcus Smith to Ashley Woessner as his brother, though the two were unrelated. (T.T. 475). Additionally, when police interrogated Appellant about the shooting death of Dane Smith he became angry and several times stated, "I did not shoot my brother." (T.T. 595).

Appellant exited Helms's residence and waited on her front porch, anticipating Smith's arrival there. Appellant's friend Donta Ripley was already waiting outside for Appellant, and joined him on the porch. (T.T. 317, 322). Dane Smith arrived at approximately 2:00 P.M. and Appellant walked down the porch steps to confront him. The two argued and Smith began to walk away. Appellant yelled for Smith to stop, but he continued to walk away. Appellant pulled out a sawed-off shotgun and shot into the air, prompting both Smith and Ripley to run down Reed Street towards Centre Avenue. (T.T. 135, 179, 199, 208-210, 257, 323-325, 593-594).

Appellant, shotgun in hand, chased Smith onto Centre Avenue where Smith darted back and forth between midday traffic in an attempt to avoid Appellant. (T.T. 179-180, 186, 211, 226, 319-320, 325-326). Appellant shot at Smith striking him on the right side with shotgun pellets. (T.T. 239-242, 258-259). Despite being shot, Smith managed to maneuver around a truck on Centre Avenue, but Appellant followed him as Smith pleaded, "Don't shoot me. I didn't make this phone call. I had nothing to do with it." (T.T. 256, 260, 263-264). Appellant shot Smith again, this time grazing his right arm and causing him to fall to the ground. (T.T. 188, 229, 245-246, 265, 285). From the ground Smith again pleaded with Appellant, "You don't have to do this." (T.T. 230). Appellant stood

over Smith, pointed the gun at him, and shot him in the head. (T.T. 188, 230-231, 243, 283, 285-286).

Appellant crossed to the opposite side of Centre Avenue and ran behind a church. (T.T. 266, 283, 331). From the parking lot behind the church, Appellant jumped over a fence and slowly jogged up the hillside away from the scene. (T.T. 268-269, 289, 306).

When police arrived Smith was found lying facedown [sic] next to the front wheel of the truck; he was bleeding from his side and had an obvious gunshot wound to the head. (T.T. 163, 305-306). He was emergently transported to Mercy Hospital but attempts to save his life were to no avail. (T.T. 352). Smith suffered a gaping wound to his right arm, a large defect in his skull, and small pellet wounds on his right hip, arm, side, abdomen, and back. (T.T. 239-242). The cause of death was multiple gunshot wounds to the head and trunk, and the manner of death was homicide. (T.T. 255).

Appellant attempted to avoid taking responsibility for Smith's death by persuading Emmanuel Robinson to turn himself in as the shooter. Robinson was a friend of both Appellant and Smith, and was of limited cognitive ability. Appellant suggested that since Appellant was expecting a child with Robinson's aunt, and since Robinson did not have a criminal record, he could take responsibility for the shooting. Woessner and Appellant drove Robinson to the building that housed the homicide office and told him to ask for Detective Sherwood. (T.T. 332-333, 421-423). Robinson went into the homicide office and confessed to the shooting, but once it became apparent that he was not the shooter based on his limited ability and inability to answer basic questions about the shooting, Detective Sherwood had Robinson escorted home. (T.T. 425-426, 561). Undeterred, Appellant directed Robinson to locate the murder weapon in the woods near the end of Brackenridge Street where he had discarded it.

Woessner drove Robinson to that location the following morning and Robinson retrieved the shotgun. (T.T. 427-428, 488). Woessner later drove Robinson to the homicide office and waited outside with the headlights shining into the lobby so she could update Appellant while Robinson went inside with the shotgun. Once inside, Robinson notified the front desk that he was there to confess to a murder and laid down on the ground with his limbs outstretched so detectives could retrieve the shotgun. Detectives escorted Robinson inside and Woessner drove away. (T.T. 431-433, 494). Once inside, Robinson told Detective Sherwood that Appellant sent him there. Robinson was arrested and charged with a firearms violation. (T.T. 407, 433-434). Upset that homicide charges had not been brought against Robinson, Appellant sent Woessner to police headquarters the following day to say that Robinson was the killer. However, once she arrived there and was interrogated by detectives, Woessner told them that Robinson was setup by Appellant to confess to a crime that Robinson did not commit. (T.T. 497-500).

Police executed a search warrant and recovered a backpack from the living room of Helms's residence on Reed Street, containing indicia for Appellant and an empty Remington shotgun shell box. (T.T. 147-149, 151-152). One 12-gauge shotgun shell was recovered from the sidewalk in front of Helms's Reed Street residence and a second 12-gauge shotgun shell was recovered from a nearby yard on Centre Avenue. It was determined that these shells were both discharged from the firearm that Appellant instructed Robinson to retrieve. (T.T. 138, 144, 161, 365-366). A 12-gauge shotgun shell wadding was recovered from Smith's brain during autopsy, and a second shotgun shell wadding was found next to the truck where Smith was found on Centre Avenue. (T.T. 165-166, 244, 365-366).

Based on the evidence above and an interview with Woessner which revealed that Appellant hid several guns at a home in North Braddock, police

obtained an arrest warrant for Appellant and a search warrant for that home. (T.T. 563). The SWAT team executed the search; their announcement prompted Appellant to flee from the front bedroom to the rear of the house, but he eventually emerged and was detained. SWAT found the duffel bag of guns described by Woessner in the front bedroom, as well as shotgun shells and a second loaded sawed-off shotgun. (T.T. 564, 567, 582, 584-585, 587). Appellant was formally arrested and charged as noted hereinabove.

Trial court opinion, 11/12/13 at 5-9.

Appellant was charged with one count of criminal homicide, two counts of person not to possess a firearm, one count of altering/obliterating mark of identification, one count of possession of a firearm with altered manufacturer's number, and two counts of prohibited offensive weapon.[1] Appellant filed a motion to suppress and a hearing was held on August 20, 2012, before the Honorable Edward J. Borkowski. The motion was denied and a jury trial immediately commenced. Appellant was subsequently convicted of first degree murder, possession of a firearm with altered manufacturer's number, and both counts of possession of a prohibited offensive weapon; he was found not guilty of altering or obliterating marks of identification.

On October 3, 2012, appellant received a mandatory sentence of life imprisonment without the possibility of parole for first degree murder, a

---

[1] The two counts of person not to possess a firearm were severed prior to trial. On August 28, 2012, appellant was found guilty of both counts.

consecutive term of 3 to 6 years' imprisonment at Count 2 (person not to possess a firearm), at Count 3 (person not to possess a firearm) and Count 5 (possession of a firearm with altered manufacturer's number) concurrent terms of 3 to 6 years' imprisonment were imposed. No further penalty was assigned for the remaining counts. Appellant's post-sentence motions were denied by an order entered on January 18, 2013, and a timely notice of appeal was filed on February 11, 2013. (Docket #21, 22.)

Herein, the following issues have been presented for our review:

I. Did the lower court err in denying the Motion to Suppress the identification made by Fannie Lauw?

II. Did the lower court err in allowing the Commonwealth to present the testimony of Dionne Walker, who provided an in-court identification after providing a vague description to detectives on the day of the incident, and after being unable to identify anyone in a photo array?

III. Did the lower court err in denying the motion for a new trial on the grounds that the verdict was against the weight of the evidence?

Appellant's brief at 3.

Appellant's first two issues argue that the trial court erred by not suppressing Fannie Lauw's and Dionne Walker's identification testimony that appellant was the shooter.

When reviewing a challenge to a trial court's denial of a suppression motion, our standard of review is:

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Delvalle*, 74 A.3d 1081, 1084 (Pa.Super. 2013), quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361-362 (Pa.Super. 2012), *appeal denied*, 57 A.3d 68 (Pa. 2012).

We find no error with either the trial court's decision or rationale. After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the first two questions raised on appeal. The trial court's opinion, filed on November 12, 2013,

comprehensively discusses and properly disposes of the question presented. We will adopt it as our own and affirm on that basis.

We note our agreement with the trial court that both witnesses had an independent basis for their identifications and both witnesses independently recognized appellant when they saw him in the courtroom. Additionally, although both witnesses failed to identify appellant positively in the photographic array after the incident, neither of them ever identified another person as the shooter. The absence of pretrial identification affects the weight of the identification evidence at trial, not its admissibility. **See Commonwealth v. Rush**, 562 A.2d 285, 289 (Pa. 1989). Accordingly, the witnesses are permitted to identify the defendant as the perpetrator at trial, if they are able to do so, subject to cross-examination regarding their failure to identify him on previous occasions. **Commonwealth v. McIntosh**, 476 A.2d 1316, 1320 (Pa.Super. 1984).

In the final issue presented, appellant argues that his convictions are against the weight of the evidence. We note our standard of review:

> Appellate review of a weight claim **is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.** Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was

> not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained[,] [t]he term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis in the original) (citations omitted).

We agree with the Commonwealth that in making his argument on appeal, appellant ignores the evidence presented against him and argues the evidence in his favor. Here, the trial court took into consideration that the jury heard identification testimony from three separate witnesses and also heard testimony concerning appellant's plan, within hours of the murder, of having Robinson falsely confess to the crime. (Trial court opinion, 11/12/13 at 18-19.) Two inmates also testified that appellant made statements about killing his brother and needing to get rid of a female witness. (*Id.*) The trial

court found that the verdict did not shock its sense of justice.  We find no reason to overturn this decision.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  10/14/2014

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,        CRIMINAL DIVISION

APPELLEE,        CC NO.: 201102575

V.

MARCUS SMITH,

APPELLANT.

## OPINION

BORKOWSKI, J.

## PROCEDURAL HISTORY

Appellant, Marcus Smith, was charged by criminal information (CC 201102575) with one count of Criminal Homicide,[1] two counts of Person Not to Possess Firearm,[2] one count of Alter/Obliterate Mark of Identification,[3] one count of Possession of Firearm with Altered Manufacturer's Number,[4] and two counts of Prohibited Offensive Weapon.[5]

Appellant filed a motion to suppress on July 16, 2012, which was heard on August 20, 2012, and denied that same day.

---

[1] 18 Pa. C.S. § 2501(a).
[2] 18 Pa. C.S. § 6105(a)(1). These charges were severed prior to trial, and the Trial Court found Appellant guilty of both counts on August 28, 2012.
[3] 18 Pa. C.S. § 6117(a).
[4] 18 Pa. C.S. § 6110.2(a).
[5] 18 Pa. C.S. § 908(a).

Appellant proceeded to a jury trial on August 20-23, 2012, at the conclusion of which Appellant was found guilty of First Degree Murder, Possession of a Firearm with Altered Manufacturer's Number, and two counts of Prohibited Offensive Weapon. Appellant was found not guilty of Altering or Obliterating Marks of Identification.

On October 3, 2012, Appellant was sentenced by the Trial Court to the following:

Count one: First Degree Murder – life incarceration without the possibility of parole;

Count two: Persons Not to Possess a Firearm – three to six years incarceration to be served consecutive to the period of incarceration imposed at count one;

Count three: Persons Not to Possess a Firearm – three to six years incarceration to be served concurrent with the period of incarceration imposed at count two;

Count five: Possession of Firearm with Altered Manufacturer's Number – three to six years incarceration to be served concurrent with the periods of incarceration imposed at counts two and three;

Count six: Prohibited Offensive Weapon – no further penalty;

Count seven: Prohibited Offensive Weapon – no further penalty.

3

On October 10, 2012, Appellant filed a post sentence motion, which was denied by the Trial Court on January 18, 2013. On February 11, 2013, Appellant filed a timely notice of appeal.

## STATEMENT OF ERRORS ON APPEAL

Appellant's claims are set forth below exactly as Appellant presented them:

A. The lower court erred in denying the Motion to Suppress the suggestive one-on-one pre-trial identification made by alleged eyewitness Fannie Lauw after she was unable to identify anyone in a photo array, and she initially told police she had only seen part of the shooter's face; and the court erred in not precluding Ms. Lauw from making an in-court identification due to the highly suggestive pretrial identification. She recognized Mr. Smith as the person she focused on in the photo array, rather than as the person she observed at the time of the shooting.

B. The lower court erred in allowing the Commonwealth to present the testimony of Dionne Walker, who gave a vague description of the shooter to the police, was unable to identify anyone in a photo array, and claimed to recognize Mr. Smith only after she saw him at trial in what amounted to a suggestive one-on-one identification.

C. The verdict was against the weight of the evidence insofar as the testimony of Commonwealth's alleged eyewitnesses, Fannie Lauw, Dione Jackson, and Donta Ripley, was unreliable insofar as their observations were made under extremely limited circumstances, were vague, uncertain and contradictory, and they gave different versions of what they saw to the police at different times. Ms. Lauw's and Ashley Woessner's testimony in particular became more detailed and inculpatory over time. In addition, the inmates who testified against Mr. Smith had a motive to fabricate their claims that Mr. Smith told them that he shot someone. Other Commonwealth witnesses, including criminals with crimen falsi convictions, who had received reduced bonds and had pending charges, were biased or had reason to make up stories implicating Mr. Smith in the death of

his close friend. Finally, someone else confessed to the police to committing the crime on two separate occasions, and that person was observed in the area of the shooting. Testimonial evidence and physical evidence, including a baseball cap with his DNA found at the scene, and evidence found in Manny Robinson's possession, including the murder weapon and shotgun shells, corroborated his admissions of guilt. Thus, the guilty verdict could only have been based on surmise and conjecture.

## FINDINGS OF FACT

Appellant spent the morning of February 12, 2011, at the home of Tanisha Helms in the Hill District section of the City of Pittsburgh. (T.T. 146-147, 157, 593).[6] While there Appellant returned a phone call from his girlfriend, Ashley Woessner, who confronted him about getting another woman pregnant. (T.T. 476-477). Appellant, assuming that their mutual friend Dane Smith had told Woessner about the other woman, became upset with Smith. Smith and Appellant referred to each other as brothers even though they were unrelated.[7] He told Woessner, "Dane is lying. Say no more, he is gone," and hung up on Woessner. (T.T. 475, 477, 595).

Appellant exited Helms's residence and waited on her front porch, anticipating Smith's arrival there. Appellant's friend Donta Ripley was already waiting outside for Appellant, and joined him on the porch. (T.T. 317, 322). Dane Smith arrived at approximately 2:00 P.M. and Appellant walked down the porch

---

[6] The designation "T.T." followed by numerals refers to Trial Transcript, August 20-23, 2012.
[7] It was established that Dane Smith introduced Marcus Smith to Ashley Woessner as his brother, though the two were unrelated. (T.T. 475). Additionally, when police interrogated Appellant about the shooting death of Dane Smith he became angry and several times stated, "I did not shoot my brother." (T.T. 595).

steps to confront him. The two argued and Smith began to walk away. Appellant yelled for Smith to stop, but he continued to walk away. Appellant pulled out a sawed-off shotgun and shot into the air, prompting both Smith and Ripley to run down Reed Street towards Centre Avenue. (T.T. 135, 179, 199, 208-210, 257, 323-325, 593-594).

Appellant, shotgun in hand, chased Smith onto Centre Avenue where Smith darted back and forth between midday traffic in an attempt to avoid Appellant. (T.T. 179-180, 186, 211, 226, 319-320, 325-326). Appellant shot at Smith, striking him on the right side with shotgun pellets. (T.T. 239-242, 258-259). Despite being shot, Smith managed to maneuver around a truck on Centre Avenue, but Appellant followed him as Smith pleaded, "Don't shoot me. I didn't make this phone call. I had nothing to do with it." (T.T. 256, 260, 263-264). Appellant shot Smith again, this time grazing his right arm and causing him to fall to the ground. (T.T. 188, 229, 245-246, 265, 285). From the ground, Smith again pleaded with Appellant, "You don't have to do this." (T.T. 230). Appellant stood over Smith, pointed the gun at him, and shot him in the head. (T.T. 188, 230-231, 243, 283, 285-286).

Appellant crossed to the opposite side of Centre Avenue and ran behind a church. (T.T. 266, 283, 331). From the parking lot behind the church, Appellant jumped over a fence and slowly jogged up the hillside away from the scene. (T.T. 268-269, 289, 306).

When police arrived Smith was found lying facedown next to the front wheel of the truck; he was bleeding from his side and had an obvious gunshot wound to the head. (T.T. 163, 305-306). He was emergently transported to Mercy Hospital but attempts to save his life were to no avail. (T.T. 352). Smith suffered a gaping wound to his right arm, a large defect in his skull, and small pellet wounds on his right hip, arm, side, abdomen, and back. (T.T. 239-242). The cause of death was multiple gunshot wounds to the head and trunk, and the manner of death was homicide. (T.T. 255).

Appellant attempted to avoid taking responsibility for Smith's death by persuading Emmanuel Robinson to turn himself in as the shooter. Robinson was a friend of both Appellant and Smith, and was of limited cognitive ability. Appellant suggested that since Appellant was expecting a child with Robinson's aunt, and since Robinson did not have a criminal record, he could take responsibility for the shooting. Woessner and Appellant drove Robinson to the building that housed the homicide office and told him to ask for Detective Sherwood. (T.T. 332-333, 421-423). Robinson went into the homicide office and confessed to the shooting, but once it became apparent that he was not the shooter based on his limited ability and inability to answer basic questions about the shooting, Detective Sherwood had Robinson escorted home. (T.T. 425-426, 561). Undeterred, Appellant directed Robinson to locate the murder weapon in the woods near the end of Brackenridge

Street where he had discarded it. Woessner drove Robinson to that location the following morning and Robinson retrieved the shotgun. (T.T. 427-428, 488). Woessner later drove Robinson to the homicide office and waited outside with the headlights shining into the lobby so she could update Appellant while Robinson went inside with the shotgun. Once inside, Robinson notified the front desk that he was there to confess to a murder and laid down on the ground with his limbs outstretched so detectives could retrieve the shotgun. Detectives escorted Robinson inside and Woessner drove away. (T.T. 431-433, 494). Once inside Robinson told Detective Sherwood that Appellant sent him there. Robinson was arrested and charged with a firearms violation. (T.T. 407, 433-434). Upset that homicide charges had not been brought against Robinson, Appellant sent Woessner to police headquarters the following day to say that Robinson was the killer. However, once she arrived there and was interrogated by detectives, Woessner told them that Robinson was setup by Appellant to confess to a crime that Robinson did not commit. (T.T. 497-500).

Police executed a search warrant and recovered a backpack from the living room of Helms's residence on Reed Street, containing indicia for Appellant and an empty Remington shotgun shell box. (T.T. 147-149, 151-152). One 12-gauge shotgun shell was recovered from the sidewalk in front of Helms's Reed Street residence and a second 12-gauge shotgun shell was recovered from a nearby yard

on Centre Avenue. It was determined that these shells were both discharged from the firearm that Appellant instructed Robinson to retrieve. (T.T. 138, 144, 161, 365-366). A 12-gauge shotgun shell wadding was recovered from Smith's brain during autopsy, and a second shotgun shell wadding was found next to the truck where Smith was found on Centre Avenue. (T.T. 165-166, 244, 365-366).

Based on the evidence above and an interview with Woessner which revealed that Appellant hid several guns at a home in North Braddock, police obtained an arrest warrant for Appellant and a search warrant for that home. (T.T. 563). The SWAT team executed the search; their announcement prompted Appellant to flee from the front bedroom to the rear of the house, but he eventually emerged and was detained. SWAT found the duffel bag of guns described by Woessner in the front bedroom, as well as shotgun shells and a second loaded sawed-off shotgun. (T.T. 564, 567, 582, 584-585, 587). Appellant was formally arrested and charged as noted hereinabove.

## DISCUSSION

### I.

Appellant first argues that the trial court erred in denying the motion to suppress the identification testimony of a witness, Fannie Lauw. This claim is without merit.

9

Lauw observed the final phase of the shooting unfold in front of her apartment building on Centre Avenue. She was interviewed and shown a photo array which included a photograph of Appellant. Although she focused on Appellant's photograph, she stated that she was not one hundred percent certain that Appellant was the shooter because her view of the shooter during the incident was primarily a side profile, and the photograph in the array was a full frontal picture. Lauw stated that Appellant looked very similar to the shooter. She later saw Appellant at the preliminary hearing and positively identified him. (T.T. 270-272, 291-292, 294).

The Pennsylvania Supreme Court has enunciated the standard of review for a trial court's denial of a motion to suppress as follows:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct .... [W]e must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Those properly supported facts are binding upon us and we may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (citations and quotations omitted). Specifically, in Appellant's motion to suppress he alleged the following:

1. A Commonwealth witness, Fannie Lauw, initially advised police that she was unable to select anyone out of a photo-array

including a photo of the defendant on or about the date of the killing of 2-12-11.

2. The Commonwealth has alleged that Ms. Lauw was a subpoenaed witness at the defendant's preliminary hearing scheduled for 2-25-11.

3. The Pittsburgh Police insured that Ms. Lauw was provided an opportunity to see the red clothed, cuffed defendant as the defendant's case was called and the witness, in essence, made a one-on-one identification under the most unreliable of circumstances.

4. The defense suggests that Ms. Lauw's identification of the defendant under the above-cited circumstances is severely tainted and should bar any in-court identification by Ms. Lauw.

5. The defense suggests that Ms. Lauw was never realistically expected to be a witness and to position her in a courtroom where she would be provided a one-on-one identification opportunity appears to be on unvarnished attempt to violate the defendant's constitutional protections.

6. On 6-8-12, Ms. Lauw revealed to ADA Rob Schupansky that she could now make an identification of the defendant in light of her one-on-one identification at the preliminary hearing despite her failure to select the defendant at a prior photo array. (Mr. Shupanksy promptly advised the defense of the "new" evidence.)

7. The defendant suggests that any out-of-court and/or in-court identification be suppressed as a result of illegality based on a violation of his state and federal constitutional protections.

Omnibus Pre-Trial Motion, July 16, 2012.

In reviewing the propriety of identification testimony, the reviewing court must determine whether, under the totality of the circumstances, the identification is reliable. *Commonwealth v. Moye*, 836 A.2d 973, 976 (Pa. Super. 2003). When the allegedly unreliable identification occurs in a courtroom, the identification is reviewed as follows:

> The suggestive quality arising from a courtroom confrontation is created by the fact that the accused is clearly designated by his role in the proceeding as the suspected perpetrator prior to the identification. The type of inherent suggestiveness present in all one-to-one confrontations is present, and to some extent magnified, where the identification is made in open court.... Nevertheless, the key in determining the admissibility of such evidence is not simply the suggestiveness of the circumstances surrounding the identification but rather the likelihood of misidentification.

*Commonwealth v. Ferguson*, 475 A.2d 810, 815 (Pa. Super. 1984). Several factors to be considered include the witness's opportunity to view the perpetrator during the event, the witness's degree of attention during the event, the accuracy of prior descriptions of the perpetrator, the witness's level of certainty regarding the identification, and the time lapse between the event and the identification. *Commonwealth v. Brown*, 23 A.3d 544, 558 (Pa. Super. 2011).

At the conclusion of the suppression hearing, the Trial Court made the following findings of fact: (1) on February 12, 2011, Lauw heard an initial gunshot and then opened her third floor window; (2) there were no internal or external obstructions of her view of Centre Avenue; (3) it was a clear, sunny day; (4) her window was approximately forty feet from Smith's final resting place; (5) Lauw kept her eyes on the shooter until he escaped up a hill and police arrived on scene; (6) Lauw had her niece call 911 while she continued to observe the event; (7) Lauw was shown an eight person photo array, including a picture of Appellant, on the day of the shooting; (8) Lauw focused on Appellant's photo in the array, but

requested a side view picture as she mostly viewed the shooter from the side; (9) a side view picture was unavailable; (10) while noting that Appellant looked very similar to the shooter, Lauw stated that she could not identify anyone in the photographs because she was not one hundred percent sure; (11) Lauw entered the preliminary hearing courtroom during another individual's hearing on February 25, 2011; (12) Lauw saw Appellant walk into the courtroom on the other side of a partition and immediately recognized his face as that of the shooter; (13) Lauw immediately notified the detectives present; (14) Appellant's case had not yet been called; (15) Lauw did not see handcuffs or leg shackles on Appellant; and (16) several other defendants were present behind the partition. (T.T. 11-13, 16-18, 31, 36-41, 45-48, 50, 53-58).

Based on those findings of fact, the Trial Court found that an independent basis existed for Lauw's identification based on her focus and opportunity to view the shooting that unfolded in front of her apartment building. (T.T. 73-74). The record supports the Trial Court's findings and conclusion that the identification had an independent basis and was reliable, and thus the Trial Court properly denied Appellant's motion to suppress and permitted the in-court identification. *See Commonwealth v. McIntosh*, 476 A.2d 1316, 1320 (Pa. Super. 1984) (trial court properly found independent basis for identifications, even though witnesses were unable to identify defendant from photo array, because they had ample opportunity

to view defendant during crime, provided accurate descriptions to police, and never identified anyone else as the perpetrator, and the inability to identify defendant in a photo array went to the weight of the evidence and not its admissibility). *See also Commonwealth v. Gibson*, 688 A.2d 1152, 1163 (Pa. 1997) (cautionary instruction not required for witness's in-court identification where witness had adequate time to observe defendant during crime and while finding one photograph in array familiar, did not want to identify defendant until certain, and immediately identified defendant as shooter when witness saw defendant in person at trial).

Appellant's claim is without merit.

## II.

Appellant alleges in his second claim that the Trial Court erred in admitting the testimony of Dionne Walker. This claim is without merit.

Specifically, Appellant alleges that the identification testimony of Dionne Walker should not have been admitted because she failed to identify Appellant in a photo array, provided a vague description of the perpetrator to police, and identified Appellant for the first time at trial. However, while Walker was unable to identify Appellant in a photo array on the day of the shooting, on the first day of Appellant's trial she immediately recognized Appellant and notified the assistant district attorney and Detective Sherwood that she recognized Appellant as the

shooter.[8] The Trial Court, after reviewing the brief report of the identification, admitted the testimony. The Trial Court stated that the "circumstances of the [identification] testimony can be fully brought to bear in terms of previous failure to identify and the [inherent suggestiveness] that may attach to the proceeding itself." (T.T. 124-126, 194-195).

Walker's identification had an independent basis as the record demonstrated that: (1) Walker had an unobstructed view of Appellant holding a shotgun and chasing Smith; and (2) she previously provided police with an accurate description of Appellant. Walker was unable to identify Appellant from the photo array because the incident happened so quickly. However, she immediately recognized Appellant as the individual with the shotgun the next time she saw him (on the first day of trial) and positively identified him. (T.T. 212-213, 216-219). Thus, the Trial Court properly admitted the identification testimony of Dionne Walker, her prior inability to identify to be the subject of cross examination. (T.T. 195). *See supra* Discussion I. *McIntosh*, 476 A.2d at 1320 (prior inability to identify defendant in photo array goes to weight of the evidence, not its admissibility; and trial court properly found independent basis for in-court identification based on witnesses'

---

[8] Dionne Walker initially did not identify anyone as the shooter and did not pick Appellant out of the photo array she was shown. On the first day that she was subpoenaed to court for Appellant's trial, the district attorney and Detective Sherwood were about to go over her initial report with her when she stated that she could identify Appellant as the shooter. The district attorney immediately notified defense counsel and the Trial Court. The Trial Court ordered Detective Sherwood to prepare a report for counsel to have for purposes of discovery and cross-examination. (T.T. 124-126, 194-195).

opportunity to view defendant during the crime, prior accurate though vague descriptions of perpetrator, and the fact that the witnesses never identified anyone else as the perpetrator).

Appellant's claim is without merit.

III.

Appellant, in his final claim, alleges that all of the guilty verdicts were against the weight of the evidence based on (1) unreliable eyewitness testimony; (2) witness bias; and (3) that someone else confessed to the murder. The first argument is without merit, and the second and third arguments are waived.

Appellant alleged in his post-sentence motion that "the verdict was against the weight of the evidence inasmuch as the Commonwealth eye-witnesses, Fannie Lauw, Dione Jackson and Donta Ripley were unreliable and contradicted by the defense eyewitnesses, Keisha Scott and Shakeeta Scott." Post-Sentence Motions, October 10, 2012, at ¶ 6(b). It is axiomatic that weight claims raised for the first time on appeal are waived as appellate review of weight claims is limited to the trial court's exercise of discretion in granting or denying the new trial. *Commonwealth v. Hodge*, 658 A.2d 386, 389 (Pa. Super. 1995); Pa. R. Crim. P. 607; Pa. R. App. P. 302. Furthermore, a "theory of error different from that presented to the trial jurist is waived on appeal, even if both theories support the same basic allegation of error which gives rise to the claim for relief."

*Commonwealth v. Gordon*, 528 A.2d 631, 638 (Pa. Super. 1987). As Appellant raises the second and third arguments under his weight claim for the first time on appeal, these arguments are waived and the Trial Court may only address the properly preserved argument regarding the eyewitness credibility.

With respect to a weight challenge based on the credibility of witness testimony, the Superior Court has held as follows:

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Trippett*, 932 A.2d 188, 198 (Pa. Super. 2007) (citations and quotations omitted). An abuse of discretion will only be found where the decision of the trial court is "manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). Further, the fact finder is free to believe all, part, or none of the testimony offered in assessing the credibility of witnesses. *Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004).

17

As discussed above, the Trial Court properly admitted the identification testimony of Fannie Lauw and Dionne Walker, and the jury also heard identification testimony from Donta Ripley. *See supra* Discussion I and II. With respect to identification testimony, the Superior Court has held as follows:

> Evidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

*Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (citations and quotations omitted). Appellant's claim that the verdicts were against the weight of the evidence is without merit.

The jury heard testimony that Appellant pressured Robinson into confessing to the crime. This was confirmed by the testimony of Donta Ripley and Ashley Woessner. (T.T. 324-333, 480, 484-497). Additionally, the jury heard testimony from several eyewitnesses, three of whom positively identified Appellant as the shooter. (T.T. 212-213, 267, 272, 324-331). Finally, two inmates testified to statements made by Appellant regarding killing his brother and having to get rid of a female witness on his case. The jury clearly found these witnesses credible, and

thus the Trial Court did not abuse its discretion in denying Appellant's weight claim. *See Commonwealth v. Smith*, 861 A.2d 892, 895-896 (Pa. 2004) (first degree murder conviction not against the weight of the evidence where the jury found the Commonwealth witness credible and found defendant's version of events incredible). *See also Trippett*, 932 A.2d at 198-199 (it is outside the purview of the Superior Court's review to rule on the credibility of witnesses).

Appellant's claim is without merit.

## CONCLUSION

Based upon the foregoing, the judgment of sentence imposed by this Court should be affirmed.

By the Court,

DATE: 11/12/13

_____ J.

Edward J. Borkowski